1  Robert T. Eglet
   Robert M. Adams
2  Erica D. Entsminger
   **EGLET ADAMS**
3  400 South Seventh Street, Suite 400
4  Las Vegas, NV 89101
   Telephone: (702) 450-5400
5  Facsimile: (702) 450-5451
   reglet@egletlaw.com
6  badams@egletlaw.com
7  eentsminger@egletlaw.com
   eservice@egletlaw.com
8
9  Andrew N. Friedman (*pro hac vice to be submitted*)
10 Douglas J. McNamara (*pro hac vice to be submitted*)
11 Geoffrey A. Graber (*pro hac vice to be submitted*)
12 Paul Stephan (*pro hac vice to be submitted*)
13 **COHEN MILSTEIN SELLERS & TOLL PLLC**
14 1100 New York Ave. NW
   East Tower, 5th Floor
15 Washington, DC 20005
16 Telephone: (202) 408-4600
   Facsimile: (202) 408-4699
17 afriedman@cohenmilstein.com
18 dmcnamara@cohenmilstein.com
   ggraber@cohenmilstein.com
19 pstephan@cohenmilstein.com

Eric H. Gibbs (*pro hac vice to be submitted*)
David M. Berger (*pro hac vice to be submitted*)
**GIBBS LAW GROUP LLP**
505 14th Street, Suite 1110
Oakland, California 94612
Telephone: (510) 350-9700
Facsimile: (510) 350-9701
ehg@classlawgroup.com
dmb@classlawgroup.com

Karen Hanson Riebel (*pro hac vice to be submitted*)
Kate M. Baxter-Kauf (*pro hac vice to be submitted*)
**LOCKRIDGE GRINDAL NAUEN P.L.L.P.**
100 Washington Ave. S., Suite 2200
Minneapolis, MN 55401
Telephone: (612) 339-6900
Facsimile: (612) 339-0981
khriebel@locklaw.com
kmbaxter-kauf@locklaw.com

20

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| DELORES SCOTT AND RYAN BOHLIM, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED, | CASE NO. |
| | CLASS ACTION |
| **PLAINTIFFS,** | COMPLAINT FOR DAMAGES, EQUITABLE, DECLARATORY AND INJUNCTIVE RELIEF |
| v. | |
| MGM RESORTS INTERNATIONAL, | JURY DEMAND |
| **DEFENDANT** | |

EGLET ADAMS

Plaintiffs Delores Scott and Ryan Bohlim, individually and on behalf of all others similarly situated, bring this action against MGM Resorts International for damages and equitable, declaratory, and injunctive relief. Plaintiffs allege as follows:

## INTRODUCTION

1. In summer 2019, MGM discovered that its computer networks had been hacked and records on millions of its customers had been stolen. Instead of coming clean, however, it buried the news, hoping the MGM Data Breach and its inadequate cybersecurity controls would fly under the radar.

2. In September 2019, MGM privately notified some of the affected guests that their information had been stolen, while giving them false assurances that the situation was contained and that their personal information had *not* been widely disseminated.

3. Despite MGM's assurances, in February 2020, security researchers at *ZDNet* discovered a set of data on a well-known online hackers' forum containing the personal details of more than 10.6 million MGM guests.

4. When *ZDNet* discovered this data set, it immediately reached out to MGM. The hotel chain confirmed that the data came from a security incident that had occurred the prior year, which it had chosen not to publicly disclose.

5. MGM still has not acknowledged the full scope of the data breach. It has confirmed, however, that breach exposed over 10 million of its customers' Personally Identifying Information ("PII"), including data such as their names, addresses, driver's license numbers, passport numbers, military identification numbers, phone numbers, email addresses, and dates of birth.

2

6.   As part of its business, MGM collects PII from its customers and individuals who visit its casinos or stay in its hotels. Those people share their information with MGM, expecting it will keep the data safe and not expose it to the world.

7.   The MGM Data Breach was a direct result of MGM's failure to implement adequate and reasonable cyber-security procedures and protocols necessary to protect customer PII.

8.   Plaintiffs, individually and on behalf of all others similarly situated, allege claims under the Nevada Consumer Fraud Act, (Nev. Rev. Stat. § 41.6000), the California Unfair Competition Law (Cal. Bus. & Prof. Code § 17200), the California Consumer Privacy Act (Cal. Civ. Code § 1798.100, *et seq.*), and for negligence, negligence per se, breach of implied contract, and unjust enrichment. Plaintiffs, individually and on behalf of all others similarly situated, pray that the Court compel MGM to adopt reasonably sufficient security practices to safeguard customer PII in its custody in order to prevent an incident like the MGM Data Breach from reoccurring, and to grant such other relief as the Court deems just and proper.

## JURISDICTION AND VENUE

9.   This Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million, exclusive of interest and costs. The putative class contains millions of members, many of whom, including Plaintiffs, have citizenship diverse from MGM.

10.   This Court has jurisdiction over MGM because its principal place of business is in the District of Nevada, it operates in this District, and the computer systems implicated in the MGM Data Breach are likely based in this District. Through its business operations in

3

this District, MGM intentionally avails itself of the markets within this District such that the exercise of jurisdiction by this Court is just and proper.

11.    Venue is proper under 28 U.S.C. § 1391(b)(1) because MGM resides in Nevada. Venue is also proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to this action occurred in this District; MGM is based in this District, maintains customer PII in the District and has caused harm to Plaintiffs and Class Members residing in this District.

## PARTIES

12.    Plaintiff Delores Scott is a resident and citizen of Wisconsin. She stayed at the MGM Grand Hotel numerous times during the relevant time period and provided her PII to MGM in connection with those stays. In 2019, she received a data breach notification from MGM informing her that she had been impacted by the MGM Data Breach. As a consequence of the MGM Data Breach, Ms. Scott has been forced to invest significant time carefully monitoring her accounts on a daily basis to detect and reduce the consequences of likely identity fraud.

13.    Plaintiff Ryan Bohlim is a resident and citizen of California. He has stayed at MGM properties, often several times a year, for decades. He provided his PII to MGM in connection with those stays. In 2019, he received a data breach notification from MGM informing him that he was impacted by the MGM Data Breach. As a consequence of the MGM Data Breach, Mr. Bohlim spends time monitoring his accounts and he uses an identity protection service to reduce the consequences of likely identity fraud.

14.    Plaintiffs' PII was stolen as a result of the MGM Data Breach, causing actual injury to Plaintiffs including, but not limited to: (a) paying monies to MGM for its goods and

services, which Plaintiffs would not have done had MGM disclosed that it lacked data security practices adequate to safeguard consumers' PII from theft; (b) damages to and diminution in the value of Plaintiffs' PII—a form of intangible property that Plaintiffs entrusted to MGM as a condition of receiving its services; (c) loss of their privacy; and (d) injury arising from the increased risk of fraud and identity theft, including the cost of taking reasonable identity theft protections measures, which will continue for years.

15.    Defendant MGM Resorts International is a Delaware corporation headquartered at 3600 Las Vegas Boulevard, South Las Vegas, Nevada 89109. MGM is a global hospitality conglomerate that owns and operates resorts around the world. It is, of course, most well-known for its casinos and other gambling and luxury properties in Las Vegas, including: MGM Grand Las Vegas, Bellagio, ARIA, Vdara, Mandalay Bay, Delano Las Vegas, Park MGM, the Mirage, New York New York, the Luxor, and Excalibur.

## STATEMENT OF FACTS

**I.    The Data Breach**

16.    On or about July 7, 2019, hackers who gained unauthorized access to MGM's computer networks successfully exfiltrated PII of millions of MGM customers.

17.    Those hackers later disclosed a subset of that data. Since then, hackers have been sharing Plaintiffs' and other MGM guests' PII in underground hacking forums. The hackers who then publicly released this information are believed to be associated with GnosticPlayers, a hacking group that publicly released more than one billion user records in 2019 alone.

18.    According to the ZDNet article that broke the story, this data consisted of a

5

"treasure trove"[1] of MGM customer PII, including customers' names, addresses, driver's license numbers, passport numbers, military identification numbers, phone numbers, email addresses and dates of birth.

19.     In mid-February 2020, the PII of more than 10.6 million MGM guests was published on a very popular and openly-accessible hacking forum.

20.     According to internet security experts, affected MGM customers will now "face a higher risk of receiving spear-phishing emails, and being SIM swapped."[2] "[A]s with many breaches, malicious actors sometime wait months or years to tip their hand," and "the value of their particular dataset continues to have appeal, despite its age and the potential staleness in certain spots."[3]

21.     Customers are harmed for long periods of time as a result of data breaches like the one experienced by MGM customers. Once PII is stolen, fraudulent use of that information and damage to victims may continue for years. And consumer victims of data breaches are more likely to become victims of identity fraud.

## II.     MGM's Privacy Promises

22.     MGM's Privacy Policy applies to guests at its "resorts, casinos and properties." In it, MGM says it "respects your privacy." Noting that MGM often collects "sensitive information" about guests (including driver's license numbers, passport numbers, and other

---

[1] Catalin Cimpanu, *Exclusive: Details of 10.6 Million MGM Hotel Guests Posted on a Hacking Forum*, ZDNet (Feb. 19, 2020), https://www.zdnet.com/article/exclusive-details-of-10-6-million-of-mgm-hotel-guests-posted-on-a-hacking-forum/.

[2] *See id.*

[3] Doug Olenick, *MGM Admits to 2019 Data Breach Affecting 10.6 Million Customers*, SC Magazine (Feb. 20, 2020), https://www.scmagazine.com/home/security-news/data-breach/mgm-admits-to-2019-data-breach-affecting-10-6-million-customers/.

6

types of data) MGM says this information is "stored on secure servers, which are protected by firewalls and other industry standard security measures." MGM says it has security controls in place that are "designed to detect potential data breaches" and "contain and minimize the loss of data."

23.    MGM further assures its guests that "[i]n situations where your personal information is collected by third parties under contract with us for performance of their contractual duties and other purposes, we require such third parties to exercise reasonable care to protect that information."

24.    MGM claims that it implements "industry standard security measures."

25.    Despite the above assurances, MGM failed to maintain the necessary security measures, practices, and other safeguards that would have prevented the MGM Data Breach.

### III.    MGM Knew It Was A Prime Target For Hackers

26.    Data breaches have been a recurring phenomenon for large companies like MGM. There were more than 1,000 data breaches in the United States in 2016, representing a greater than 40% increase from 2015.[4] In 2017 there were even more data breaches than in 2016, a total of 1,579; this represented yet another greater-than-40% increase in data breaches for the second year in a row.[5] In 2019, there were 1,473 data breaches reported in

---

[4] Identity Theft Resource Center, *Data Breaches Increase 40 Percent in 2016, Finds New Report From Identity Theft Resource Center and CyberScout,* https://www.idtheftcenter.org/data-breaches-increase-40-percent-in-2016-finds-new-report-from-identity-theft-resource-center-and-cyberscout/.

[5] Identity Theft Resource Center, *2017 Annual Data Breach Year-End Review,* https://www.idtheftcenter.org/2017-data-breaches/.

7

the United States, a 17% increase since 2018.[6]

27.    Hotel and hospitality companies are particularly susceptible to data breaches. Trustwave's *2018 Global Security Report* lists hospitality as one of the top three industries most vulnerable to payment card breaches; others estimate that hotels are the subject of about 20% of all cyberattacks.[7] "Such unfortunate trends should not come as much of a surprise since hotels are hotbeds of sensitive information."[8]

28.    "The hospitality industry is a common target for cyber criminals because of the massive amount of data hotels hold."[9] "In late November [2018], Marriott International revealed that a massive cyberattack compromised personal information for up to half a billion individual guests of its properties. . . . . Other major organizations in the hospitality industry, including Hilton and Hyatt, have reported similar attacks. In 2017, for example, Holiday Inn parent company InterContinental Hotels discovered a breach lasting three months and affecting 1,200 properties."[10]

29.    Not only was MGM at great risk, it should have known that it was especially vulnerable.

---

[6] Identity Theft Resource Center, *Data Breach Report Reveals 17 Percent Increase in Breaches Over 2018*, https://www.idtheftcenter.org/identity-theft-resource-centers-annual-end-of-year-data-breach-report-reveals-17-percent-increase-in-breaches-over-2018/.

[7]    Hotel    management,    *Why    Cybersecurity    Matters*, https://www.hotelmanagement.net/tech/why-cybersecurity-matters.

[8] *Id.*

[9] Open Data Security, *Cybersecurity in the Hotel Industry: Lessons from Marriott Data Breach*, https://opendatasecurity.io/cybersecurity-in-the-hotel-industry-lessons-from-marriott-data-breach/.

[10] Megan Berkowitz, *Meeting the Threat in 2019: Cybersecurity for the Hospitality Sector*, Hospitality Technology (Jan. 23, 2019), https://hospitalitytech.com/meeting-threat-2019-cybersecurity-hospitality-sector.

30.     As recently as March 2020—six months *after* MGM discovered the data breach, the MGM Resorts website was still insecure. According to UpGuard, a company that publishes information security ratings, the MGM Resorts website is "at risk of being hijacked," "[v]ulnerable to cross-site scripting," and "[s]usceptible to man-in-the-middle attacks."

31.     MGM even markets itself to hackers. It routinely hosts conferences for an organization called "Black Hat." The term "black hat" refers to hackers who attack companies' systems for nefarious purposes, in contrast to "white hat" hackers, who use their hacking skills to help companies improve their security. At "Black Hat" conferences, attendees have been known to hijack wireless connections of the hotels and hack hotel billing systems.

IV.    **The MGM Data Breach Harmed Individuals, And Additional Fraud Will Result**

32.     Consumers who have been victims of data breaches are much more likely to become victims of identity fraud than those who have not. Further, each additional data breach an individual is involved in increases his or her risk of identity fraud.

33.     The Federal Trade Commission defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority." 17 C.F.R. § 248.201(9).

34.     As the FTC explains, "[o]nce identity thieves have your personal information, they can drain your bank account, run up charges on your credit cards, open new utility accounts, or get medical treatment on your health insurance." As such, PII is a highly valuable asset to ill-intending identity thieves.

35.    The Bureau of Justice Statistics has reported that, even if data thieves have not caused financial harm, data breach victims "reported spending an average of about 7 hours clearing up the issues."

36.    Identity thieves often hold onto personal information obtained to commit fraud years after free credit monitoring programs expire. Even so-called State-sponsored hacking groups, after providing the stolen information to their government client, quickly repackage and sell the same stolen information to identity thieves.

37.    In fact, the harms here are likely to be more severe because Defendant announced the breach well after it occurred. According to a 2017 study by performed New Javelin Strategy, "The quicker a financial institution, credit card issuer, wireless carrier or other service provider is notified that fraud has occurred on an account, the sooner these organizations can act to limit the damage. Early notification can also help limit the liability of a victim in some cases, as well as allow more time for law enforcement to catch the fraudsters in the act."

38.    Given the categories of information taken in the MGM breach, impacted individuals are at particular risk of having their mobile phone numbers commandeered by a fraudster, through a "SIM swapping" scheme, where the fraudster uses breached information to convince the mobile phone carrier to port-over the person's mobile phone number to a phone that the hacker controls.

39.    A hacker can then use the hijacked mobile phone number to take over all manner of online accounts, as prominent cybersecurity journalist and author Brian Krebs explains: "Phone numbers stink for security and authentication. They stink because most of us have so much invested in these digits that they've become de facto identities. At the same

10

time, when you lose control over a phone number ... whoever inherits that number can then be you in a lot of places online. As Krebs notes, we have gotten to the "point where a single, semi-public and occasionally transient data point like a phone number can unlock access to such a large part of our online experience."

## CLASS ACTION ALLEGATIONS

40.    Plaintiffs seek relief individually and as a representative of all others similarly situated. Pursuant to Fed. R. Civ. P. Rule 23(a), (b)(1), (b)(2), (b)(3) and (c)(4), Plaintiffs seeks certification of a Nationwide class defined as follows:

> All persons in the United States whose personal information was compromised in the data breach publicly announced by MGM in February 2020.

Plaintiff Bohlim also seeks certification of a California Subclass, defined as follows:

> All California residents whose personal information was compromised in the data breach publicly announced by MGM in February 2020.

41.    Excluded from the Class and Subclass are Defendant, any entity in which Defendant has a controlling interest, and Defendant's officers, directors, legal representatives, successors, subsidiaries, and assigns. Also excluded are any judge, justice, or judicial officer presiding over this matter and the members of their immediate families and judicial staff.

42.    **Numerosity**: Federal Rule of Civil Procedure 23(a)(1). The Class Members are so numerous and geographically dispersed that individual joinder of all Class Members is impracticable. Plaintiffs are informed and believe that there are at least 10.6 million class members. Given the overall class size and the proximity of MGM properties to California, it is certain that there are at least several hundred thousand Subclass Members. The individuals' names and addresses are available from Defendant's records.

11

43.    **Commonality and Predominance**: Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3). The action involves common questions of law and fact, which predominate over any questions affecting individual class members, including:

    a.  Whether Defendant knew or should have known that its systems were vulnerable to unauthorized access;

    b.  Whether Defendant failed to take adequate and reasonable measures to ensure its data systems were protected;

    c.  Whether Defendant failed to take available steps to prevent and stop the breach from happening; and

    d.  Whether Defendant breached any duty to protect the personal information of Plaintiffs, Class Members, and Subclass Members by failing to provide adequate data security; and

    e.  The amount of damages suffered by Plaintiffs, Class Members, and Subclass Members.

44.    **Typicality**: Federal Rule of Civil Procedure 23(a)(3), Plaintiffs' claims are typical of other Class and Subclass Members' claims because Plaintiffs, Class, and Subclass Members were subjected to the same allegedly unlawful conduct and damaged in the same way.

45.    **Adequacy of Representation**: Federal Rule of Civil Procedure 23(a)(4). Plaintiffs are adequate class representatives because their interests do not conflict with the interests of the Class and Subclass Members they seek to represent, Plaintiffs have retained counsel competent and experienced in complex class action litigation and data breach

litigation, and Plaintiffs intend to prosecute this action vigorously. The Class and Subclass Members' interests will be fairly and adequately protected by Plaintiffs and their counsel.

46.     **Declaratory and Injunctive Relief**: Federal Rule of Civil Procedure 23(b)(2). The prosecution of separate actions by individual Class and Subclass Members would create a risk of inconsistent or varying adjudications with respect to individual Class and Subclass Members that would establish incompatible standards of conduct for Defendant. Such individual actions would create a risk of adjudications that would be dispositive of the interests of other Class and Subclass Members and impair their interests. Defendant has acted and/or refused to act on grounds generally applicable to the Class and Subclass, making final injunctive relief or corresponding declaratory relief appropriate.

47.     **Superiority**: Federal Rule of Civil Procedure 23(b)(3). A class action is superior to any other available means for the fair and efficient adjudicating of this controversy, and no unusual difficulties are likely to be encountered in the management of this case. Relative to the burden and expense that would be required to individually litigate the claims, the damages suffered by Plaintiffs, Class, and Subclass Members are comparatively small, so it would be impracticable for them to individually seek redress for Defendant's wrongful conduct. Even if Class and Subclass Members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

48.     MGM has physical and email addresses for Class and Subclass Members who

therefore may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. mail, electronic mail, internet postings, and/or published notice.

49.    Particular issues under Rule 23(c)(4), including those listed in Paragraph 43, are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein.

**COUNT I**
**VIOLATION OF NEVADA'S CONSUMER FRAUD ACT**
**Nevada Revised Statutes § 41.6000**
*(asserted by all Plaintiffs on behalf of the Class)*

50.    Plaintiffs restate and reallege Paragraphs 1 through 48 as if fully set forth herein.

51.    MGM engaged in unfair and unlawful acts and practices by failing to maintain adequate procedures to avoid a data breach, and permitting access to consumer reports by data thieves, for whom MGM had no reasonable grounds to believe would be used for a proper purpose. Plaintiffs and Class Members relied on MGM's implied promise of data security when providing their PII to MGM.

52.    MGM is subject to the Nevada Consumer Fraud Act, Nev. Rev. Stat. § 41.6000 because it is headquartered in and does business in Nevada.

53.    Under § 41.6000(2)(e), MGM engaged in a deceptive trade practice as defined in §§ 598.0915–598.0925. MGM's interactions with Plaintiffs and the Class wherein MGM made statements and omissions suggesting that it would adequately protect customers' PII when, in fact, it did not. In particular, and without limitation, MGM "[t]ender[ed] a lease of

goods advertised for sale or a sale of goods advertised for lease or tendering terms of sale or lease less favorable than the terms advertised" under § 598.0917(7). MGM also "[k]nowingly ma[de a] false representation in a transaction."

54.    MGM also engaged in a deceptive trade practice by "[v]iolat[ing] a state or federal statute or regulation relating to the sale or lease of goods or services" under § 598.0923, and engaged in "consumer fraud" as provided in § 41.600(1). Among other statutes and regulations, MGM violated the Federal Trade Commission Act, 15 U.S.C. § 45, and its implementing regulations, which require companies to adequately and reasonably protect consumer data from compromise.

55.    MGM violated § 603A.210, requiring that "A data collector that maintains records which contain personal information of a resident of this State shall implement and maintain reasonable security measures to protect those records from unauthorized access, acquisition, destruction, use, modification or disclosure." MGM failed to take the required reasonable security measures.

56.    MGM also breached its duty under Nev. Rev. Stat. § 603A.215(1), requiring any data collector doing business in Nevada who accept payment cards in connection with a sale of goods or services to "comply with the current version of the . . . PCI Security Standards Council . . . with respect to those transactions." MGM failed to adhere to PCI standards.

57.    As a direct and proximate result of the foregoing, Plaintiffs and Class Members have suffered injuries including, but not limited to, actual damages, and in being denied a statutory benefit conferred on them by the Nevada legislature.

58.    As a result of these violations, Plaintiffs and Class Members are entitled to damages and other remedies as set forth below.

15

## COUNT II
## VIOLATION OF THE CALIFORNIA UNFAIR COMPETITION LAW
### Cal. Bus. & Prof. Code § 17200, *et seq.*
### (*asserted by Plaintiff Bohlim on behalf of the California Subclass*)

59.     Plaintiff restate and realleges Paragraphs 1 through 58 as if fully set forth herein.

60.     MGM violated Cal. Bus. and Prof. Code §17200, et seq., by engaging in unlawful, unfair or fraudulent business acts and practices and unfair, deceptive, untrue or misleading advertising that constitute acts of "unfair competition" as defined in Cal. Bus. Prof. Code § 17200 with respect to the services provided.

61.     MGM engaged in unfair and unlawful acts and practices by establishing sub-standard security practices and procedures as described herein; by failing to maintain adequate procedures to avoid a data breach; by soliciting and collecting Plaintiff's and Subclass Members' PII with knowledge that the information would not be adequately protected; by omitting the fact of its inadequate data security in its communications with and representations to Plaintiff and Subclass Members; and by permitting access to consumer information by data thieves. These unfair acts and practices were immoral, unethical, oppressive, unscrupulous, unconscionable, and/or substantially injurious to Plaintiff and Subclass Members. MGM's acts and practices were likely to deceive the public into believing their PII was securely stored, when it was not. The harm these practices caused to Plaintiff and the Subclass Members outweighed their utility, if any.

62.     MGM engaged in unfair acts and practices with respect to the provision of services by failing to take proper action following the data breach to enact adequate privacy and security measures and protect Plaintiff and the Subclass Members' PII from further

unauthorized disclosure, release, data breaches, and theft. These unfair acts and practices were immoral, unethical, oppressive, unscrupulous, unconscionable, and/or substantially injurious to Plaintiff and Subclass Members.

63.    MGM also engaged in unlawful practices by storing Plaintiff and Subclass Members' PII in an unsecure electronic environment in violation of California's data breach statutes, Cal. Civ. Code § 1798.81.5 and § 1798.150, which require businesses to take reasonable steps to safeguard the PII of Plaintiff and Subclass Members, and in violation Section 5 of the FTC Act, as described below in paragraphs 107-08.

64.    In addition, MGM engaged in unlawful acts and practices by failing to disclose the data breach to Plaintiff and Subclass Members in a timely and accurate manner, contrary to the duties imposed by Cal. Civ. Code § 1798.82. To date, MGM has still not provided adequate information.

65.    As a direct and proximate result of the foregoing, Plaintiff and Subclass Members have suffered injuries including but not limited to actual damages, and in being denied a statutory benefit conferred on them by the California legislature.

66.    MGM knew or should have known that its computer systems and data security practices were inadequate to safeguard Plaintiff and Subclass Members' PII and that the risk of a data breach or theft was highly likely. MGM's actions in engaging in the above-named unlawful practices and acts were negligent, knowing and willful, and/or wanton and reckless with respect to the rights of Plaintiff and Subclass Members.

67.    MGM engaged in an unfair practice by engaging in conduct that is contrary to public policy, unscrupulous, and caused injury to Plaintiff and Subclass Members.

17

68.    As a direct and proximate result of the foregoing, Plaintiff and Subclass Members have suffered injuries including, but not limited to actual damages, and in being denied a benefit conferred on them by the California legislature.

69.    As a result of these violations, Plaintiff and Subclass Members are entitled to damages and other remedies as set forth below.

**COUNT II**
**VIOLATION OF THE CALIFORNIA CONSUMER PRIVACY ACT**
**Cal. Bus. & Prof. Code § 1798.100,** *et seq.*
**(*asserted by Plaintiff Bohlim on behalf of the California Subclass*)**

70.    Plaintiff Bohlim restates and realleges Paragraphs 1 through 58 as if fully set forth herein.

71.    Cal. Civ. Code § 1798.150(a)(1) provides that "Any consumer whose nonencrypted and nonredacted personal information, as defined in subparagraph (A) of paragraph (1) of subdivision (d) of Section 1798.81.5, is subject to an unauthorized access and exfiltration, theft, or disclosure as a result of the business's violation of the duty to implement and maintain reasonable security procedures and practices appropriate to the nature of the information to protect the personal information may institute a civil action."

72.    The Subclass includes consumers as defined in § 1798.140(g).

73.    Plaintiff's and the Subclass's nonencrypted and nonredacted personal information, as defined in § 1798.81.5(d)(1), was exfiltrated in the MGM Data Breach, including their names, Social Security numbers, passport, and driver's license numbers.

74.    MGM violated its duty to implement and maintain reasonable security procedures and practices. That duty includes, among other things, designing, maintaining and testing MGM's information security controls to ensure that PII in its possession was

18

adequately secured and employees with information security-related responsibilities were adequately trained.

75.     MGM's conduct created a foreseeable risk of harm to Plaintiff and the Subclass Members. MGM's misconduct included, but was not limited to, its failure to take the steps and opportunities to prevent the MGM Data Breach as set forth herein. MGM's misconduct also included its decision not to comply with applicable cybersecurity standards, and its failure to timely notify consumers and other relevant parties after the MGM Data Breach.

76.     MGM knew or should have known that its computer systems and information security controls were inadequate to safeguard Plaintiff and Class Members' PII and that unauthorized access and exfiltration, theft, or disclosures, was highly likely as a result. MGM's actions in engaging in the above-named unlawful practices and acts were negligent, knowing, and willful, and/or wanton and reckless with respect to the rights of Plaintiff and Subclass Members.

77.     As a direct and proximate result of the foregoing, Plaintiff and the Subclass Members have suffered injuries including but not limited to actual damages, and in being denied a statutory benefit conferred on them by the California legislature.

78.     As a result of these violations, Plaintiff and the Subclass Members are entitled to actual pecuniary damages, injunctive or declaratory relief, and any other relief that the Court deems proper. Plaintiff reserves the right to amend this Complaint to seek statutory damages under the CCPA on behalf of himself and the Subclass after providing MGM with the written notice required by Cal. Civ. Code § 1798.150(b).

. . .

. . .

**COUNT III**
**NEGLIGENCE**
(*asserted by all Plaintiffs on behalf of the Class*)

79.    Plaintiffs restate and reallege Paragraphs 1 through 58 as if fully set forth herein.

80.    Plaintiffs and Class Members were required to provide their PII, including their names, addresses, dates of birth, telephone numbers, email addresses, and various forms of identification to MGM as a condition of their use of MGM's services.

81.    Plaintiffs and Class Members paid money to MGM in exchange for services, along with MGM's promise to protect their PII from unauthorized disclosure.

82.    Plaintiffs and the Class Members entrusted their PII to MGM with the understanding that MGM would safeguard that information and especially PII.

83.    In their written privacy policies, MGM expressly promised Plaintiffs and Class Members that it would only disclose PII under certain circumstances, none of which relate to the MGM Data Breach. In addition, MGM promised to comply with industry standards and to make sure that Plaintiffs' and Class Members' PII would remain protected.

84.    MGM had full knowledge of the sensitivity of the PII and the types of harm that Plaintiffs and Class Members could and would suffer if the PII were wrongfully disclosed.

85.    MGM had a duty to exercise reasonable care in safeguarding, securing and protecting such information from being compromised, lost, stolen, misused, and/or disclosed to unauthorized parties. This duty includes, among other things, designing, maintaining and testing the MGM's security protocols to ensure that PII in its possession was adequately secured and protected and that employees tasked with maintaining such information were adequately training on cyber security measures regarding the security of

20

such information.

86.    Plaintiffs and the Class Members were the foreseeable and probable victims of any inadequate security practices and procedures. MGM knew of or should have known of the inherent risks in collecting and storing the PII of Plaintiffs and the Class, the critical importance of providing adequate security of that PII, the current cyber scams being perpetrated and that it had inadequate employee training and education and IT security protocols in place to secure the PII of Plaintiffs and the Class.

87.    MGM's own conduct created a foreseeable risk of harm to Plaintiffs and Class Members. MGM's misconduct included, but was not limited to, its failure to take the steps and opportunities to prevent the MGM Data Breach as set forth herein. MGM's misconduct also included its decision not to comply with industry standards for the safekeeping and encrypted authorized disclosure of the PII of Plaintiffs and Class Members.

88.    Plaintiffs and the Class Members had no ability to protect their PII that was in MGM's possession.

89.    MGM was in a position to protect against the harm suffered by Plaintiffs and Class Members as a result of the MGM Data Breach.

90.    MGM had a duty to put proper and adequate procedures in place in order to prevent the unauthorized dissemination of Plaintiffs' and Class Members' PII.

91.    MGM has admitted that Plaintiffs' and Class Members' PII was wrongfully disclosed to unauthorized third persons as a result of the MGM Data Breach.

92.    MGM, through its actions and/or omissions, unlawfully breached its duty to Plaintiffs and Class Members by failing to exercise reasonable care in protecting and safeguarding the Plaintiffs' and Class Members' PII while it was within the MGM's possession

or control.

93.     MGM improperly and inadequately safeguarded Plaintiffs' and Class Members' PII in deviation of standard industry rules, regulations and practices at the time of the MGM Data Breach.

94.     MGM, through its actions and/or omissions, unlawfully breached its duty to Plaintiffs and Class Members by failing to have appropriate procedures in place to detect and prevent dissemination of its customers' PII.

95.     MGM, through its actions and/or omissions, unlawfully breached its duty to adequately disclose to Plaintiffs and Class Members the existence, and scope of the MGM Data Breach.

96.     But for MGM's wrongful and negligent breach of duties owed to Plaintiffs and Class Members, Plaintiffs' and Class Members' PII would not have been compromised.

97.     There is a temporal and close causal connection between MGM's failure to implement security measures to protect the PII and the harm suffered, or risk of imminent harm suffered by Plaintiffs and the Class.

98.     As a result of these violations, Plaintiffs and Class Members are entitled to damages and other remedies as set forth below.

**COUNT IV**
**NEGLIGENCE PER SE**

99.     Plaintiffs restate and reallege Paragraphs 1 through 58 as if fully set forth herein.

100.     Section 5 of the FTC Act prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as MGM, of failing to use reasonable measures to protect PII. The FTC

publications and orders described above also form part of the basis of MGM's duty in this regard.

101.    MGM violated Section 5 of the FTC Act by failing to use reasonable measures to protect customer PII and not complying with applicable industry standards, as described in detail herein. MGM's conduct was particularly unreasonable given the nature and amount of PII it obtained and stored, and the foreseeable consequences of a data breach including, specifically, the damages that would result to Plaintiffs and Class Members.

102.    In addition, as described above, MGM also violated Nevada state consumer protection and unfair competition laws.

103.    MGM's violation of Section 5 of the FTC Act, along with California and Nevada state law, constitutes negligence per se. MGM's violation of these laws establishes the duty and breach elements of negligence.

104.    Plaintiffs and Class Members are within the class of persons that these laws were intended to protect.

105.    The harm that occurred as a result of the MGM Data Breach is the type of harm these laws were intended to guard against. For example, the FTC and the Nevada Attorney General have pursued enforcement actions against businesses, which, as a result of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm as that suffered by Plaintiffs and the Class.

106.    As a direct and proximate result of MGM's negligence per se, Plaintiffs and the Class have suffered, and continue to suffer, injuries and damages arising from the MGM Data Breach including, but not limited to: damages from lost time and effort to mitigate the actual and potential impact of the MGM Data Breach on their lives, including by placing "freezes"

and "alerts" with credit reporting agencies, contacting their financial institutions, closing or modifying financial and medical accounts, closely reviewing and monitoring their credit reports and various accounts for unauthorized activity, and filing police reports, and damages from identity theft, which may take months if not years to discover and detect.

107.    As a result of these violations, Plaintiffs and Class Members are entitled to damages and other remedies as set forth below.

**COUNT V**
**BREACH OF IMPLIED CONTRACTUAL TERM**

108.    Plaintiffs restate and reallege Paragraphs 1 through 58 as if fully set forth herein.

109.    Plaintiffs and Class Members contracted with Defendant to provide them with hotel accommodation and other services.

110.    Plaintiffs and Class Members met all or substantially all of their contractual obligations under those contracts.

111.    To obtain the contracted hotel accommodations and other services, Plaintiffs and Class Members were required to provide MGM with PII, such as their names, addresses, dates of birth, telephone numbers, email addresses, and other forms of identification.

112.    Plaintiffs and the Class Members entrusted their PII to MGM with the understanding that MGM would safeguard that information.

113.    Plaintiffs and Class Members paid money to MGM in exchange for accommodation and other services and MGM promised, among other things, to protect Plaintiffs' and Class Members' Personal Information from unauthorized disclosure.

114.    There is not one integrated contract that spells out MGM's obligations to

24

Plaintiffs and Class Members, but those obligations can be determined by reference to MGM's Privacy Policy.[11]

115.    As stated in its Privacy Policy, MGM agreed to store and maintain Plaintiffs' and Class Members' information "on systems protected by industry standard security measures."

116.    In its Privacy Policy, MGM promised that its staff are "required to take reasonable measures to ensure that unauthorized persons cannot view or access your Personal Information."

117.    In its Privacy Policy, MGM promised Plaintiffs' and Class Members that it would only disclose PII under certain circumstances, none of which relate to the MGM Data Breach.

118.    MGM had full knowledge of the sensitivity of the PII and the types of harm that Plaintiffs' and Class Members could and would suffer if the PII were wrongfully disclosed.

119.    This exchange constitutes an implied contractual term between Plaintiffs and Class Members and MGM.

120.    MGM, however, breached these contractual terms with Plaintiffs and Class Members by failing to reasonably safeguard and protect Plaintiffs and Class Members' PII, which was compromised as a result of the MGM Data Breach.

121.    Without such implied contracts, Plaintiffs and Class Members would not have provided their PII to MGM.

---

[11] MGM's Privacy Policy applicable at the time of the MGM Data Breach is available at: https://web.archive.org/web/20190801141123/https://www.mgmresorts.com/en/privacy-policy.html.

122.   As a result of these violations, Plaintiffs and Class Members are entitled to damages and other remedies as set forth below.

**COUNT VI**
**UNJUST ENRICHMENT**

123.   Plaintiffs restate and reallege Paragraphs 1 through 58 as if fully set forth herein.

124.   Plaintiffs and Class Members conferred a monetary benefit on MGM. Specifically, they purchased goods and services from MGM and in so doing provided MGM with their PII. In exchange, Plaintiffs and Class Members should have received from MGM the goods and services that were the subject of the transaction and have their PII protected with adequate data security.

125.   MGM knew that Plaintiffs and Class Members conferred a benefit which MGM accepted. MGM profited from these transactions and used the PII of Plaintiffs and Class Members for business purposes.

126.   The amounts Plaintiffs and Class Members paid for goods and services were used, in part, to pay for use of MGM's network and the administrative costs of data management and security.

127.   Under the principles of equity and good conscience, MGM should not be permitted to retain the money belonging to Plaintiffs and Class Members, because MGM failed to implement appropriate data management and security measures that are mandated by industry standards.

128.   MGM failed to secure Plaintiffs' and Class Members' PII and, therefore, did not provide full compensation for the benefit Plaintiffs and Class Members provided.

129.    MGM acquired the PII through inequitable means in that it failed to disclose the inadequate security practices previously alleged.

130.    If Plaintiffs and Class Members knew that MGM had not secured their PII, they would not have agreed to MGM's services.

131.    Plaintiffs and Class Members have no adequate remedy at law.

132.    As a direct and proximate result of MGM's conduct, Plaintiffs and Class Members have suffered and will suffer injury, including but not limited to: (i) actual identity theft; (ii) the loss of the opportunity how their PII is used; (iii) the compromise, publication, and/or theft of their PII; (iv) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, and/or unauthorized use of their PII; (v) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the MGM Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft; (vi) the continued risk to their PII, which remain in MGM's possession and is subject to further unauthorized disclosures so long as MGM fails to undertake appropriate and adequate measures to protect PII in their continued possession; and (vii) future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the impact of the PII compromised as a result of the MGM Data Breach for the remainder of the lives of Plaintiffs and Class Members.

133.    As a direct and proximate result of MGM's conduct, Plaintiffs and Class Members have suffered and will continue to suffer other forms of injury and/or harm.

134.    As a result of these violations, Plaintiffs and Class Members are entitled to damages and other remedies as set forth below.

27

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, individually and on behalf of all others similarly situated, respectfully requests the following relief:

a.    An Order certifying this case as a class action with the class definition provided herein, and appointing Plaintiffs and Plaintiffs' identified counsel to represent the Class and appointing Plaintiff Bohlim and Plaintiffs' identified counsel to represent the California Subclass;

b.    An order enjoining Defendant from engaging in the wrongful conduct alleged herein concerning disclosure and inadequate protection of Plaintiffs' and Class Members' PII;

c.    A mandatory injunction directing the Defendant to hereinafter adequately safeguard the PII of Plaintiffs and the Class by implementing improved security procedures and measures;

d.    Restitution, disgorgement, and other appropriate equitable relief;

e.    An award of compensatory, statutory, and punitive damages, as appropriate, in an amount to be determined;

f.    Declaratory relief stating that MGM failed to meet applicable information security standards, statutory and common law duties, and other obligations regarding Plaintiffs' and the Class Members' PII, and that such failure actually and proximately caused damage to Plaintiffs, the Class, and the Subclass;

g.    An award of costs and litigation expenses;

h.    An award of attorneys' fees; and

28

i.    Such other and further relief, injunctive and otherwise, as this Court may deem just and proper.

### DEMAND FOR JURY TRIAL

Plaintiffs demands a jury trial as to all issues so triable.

Dated: March 12, 2020

Respectfully submitted,

/s/ Robert T. Eglet

**EGLET ADAMS**
Robert T. Eglet
Robert M. Adams
Erica D. Entsminger
400 South Seventh Street, Suite 400
Las Vegas, NV 89101
Telephone: (702) 450-5400
Facsimile: (702) 450-5451
eservice@egletlaw.com

**GIBBS LAW GROUP LLP**
Eric H. Gibbs
David M. Berger
505 14th Street, Suite 1110
Oakland, California 94612
Telephone: (510) 350-9700
Facsimile: (510) 350-9701
ehg@classlawgroup.com
dmb@classlawgroup.com

**COHEN MILSTEIN SELLERS & TOLL PLLC**
Andrew N. Friedman
Douglas J. McNamara
Geoffrey A. Graber
Paul Stephan
1100 New York Ave. NW
East Tower, 5th Floor
Washington, DC 20005

29

Telephone: (202) 408-4600
Facsimile: (202) 408-4699
afriedman@cohenmilstein.com
dmcnamara@cohenmilstein.com
ggraber@cohenmilstein.com
pstephan@cohenmilstein.com

**LOCKRIDGE GRINDAL NAUEN
P.L.L.P.**
Karen Hanson Riebel
Kate M. Baxter-Kauf
100 Washington Ave. S., Suite 2200
Minneapolis, MN 55401
Telephone: (612) 339-6900
Facsimile: (612) 339-0981
khriebel@locklaw.com
kmbaxter-kauf@locklaw.com


ATTORNEYS FOR PLAINTIFFS
DELORES SCOTT, RYAN BOHLIM AND
THE PROPOSED CLASS